STATE v. FRANKIE et al.

No. 5042. Decided January 12, 1931. (294 P. 828.)

*Lewis Larson,* of Manti, for appellants.

*Geo. P. Parker,* Attorney General, and *L. A. Miner,* Deputy Attorney General, for the State.

STRAUP, J.

The defendants were charged with the crime of grand larceny, stealing a slaughtered buck deer in Sevier county of the alleged value of $100, the property of E. B. Ramsay. They were convicted of pettit larceny, sentenced to pay a fine of $75 each, and were ordered confined in jail not to exceed three months until the fine was paid, from which judgment the defendants prosecute this appeal.

The chief complaint is insufficiency of the evidence to show that a slaughtered deer, in possession of defendants and by them delivered to the Fennell Meat Market operated at Eureka, Juab county, by the father of defendant Fennell and in which the latter had an interest, was the deer which Ramsay had killed and slaughtered; the defendants claiming in such respect that the deer which they possessed and delivered to the meat market was a deer which they themselves had killed and slaughtered, while the claim made by the state was that the deer possessed by the defendants was the deer Ramsay had slaughtered.

The scene of the alleged larceny was in the mountains of Sevier county. The game season to kill buck deer opened

October 20, 1929. Ramsay from Richfield, Sevier county, and a party of hunters with him were camped in the mountains the night before. The defendants from Eureka and a party of hunters with them were also the night before camped in the mountains several miles from Ramsay's camp. Other hunters in different camps were also camped in various part of the mountains, some within a few miles of where the defendants were camped and some at a greater distance. On the next day, the 20th, Ramsay, in company with another hunter, in the mountains about four or five miles from his camp, shot and killed a buck deer weighing about 250 lbs. The entrails of the deer were removed, three legs of the deer disjointed at the knee, and the other, the right front leg, which was shot and broken, four or five inches above the joint. The deer was then dragged farther up the mountain and by means of a rope was hung in a tree to freeze. All this is not disputed.

It was the claim of the state that the defendants on the 22d without the knowledge or consent of Ramsay unlawfully took the deer from the tree, converted it to their own use, and delivered it to the Fennell Meat Market at Eureka. The defendants denied that, and claimed the deer which they took to the meat market was a deer which they themselves had shot and killed on the afternoon of the 22d in the mountains several miles from the place where Ramsay claimed he killed and hung the deer killed by him. That Ramsay's deer was unlawfully taken and converted by some one is not disputed. That the defendants took it, or that the deer which was possessed and taken by them to the meat market was the deer which Ramsay had killed, is disputed.

The claim thus made by the defendants is that the evidence is insufficient to connect them with the commission of the offense. In such respect it was shown by the state and admitted by the defendants that they with others were in and about their camp on the evening before the game season opened and the next three days were hunting deer

in different parts of the mountains; that the deer which Ramsay killed on the 20th was still hanging on the tree on the 21st; that on the afternoon of the 22d, Ramsay in company with others discovered that the deer was gone, found the rope cut, and indications that the deer was placed on a horse and carried down the mountains to a trail or canyon below. Further evidence was given by the state to show that the defendants that afternoon were seen with a slaughtered deer on a horse which by his tracks was to some extent identified as the same horse on which Ramsay's deer had been loaded at the place where the deer was hanging in the tree; but as to that one of the defendants at the same time stated that the slaughtered deer which they had on the horse was one which they themselves had killed that afternoon.

Ramsay and his companion testified that the deer when shot and killed by Ramsay was about seventy-five yards away on a rather steep side of the mountain and below Ramsay when he shot the deer; that the deer had three bullet wounds in his body, one a flesh wound through the brisket, one through the right front leg four or five inches above the knee, and one on the back of the deer behind the shoulders and a little to the left of the backbone, which, as testified to by them, caused the death of the deer; that the horn of the deer on one side consisted of five points and on the other side of four points; that at the place where the deer fell and was killed, the entrails and legs were removed as heretofore stated, and the deer then dragged up the mountain a distance of about 125 yards and by means of a rope hung in a tree to freeze.

Another hunter who saw the deer hanging in the tree the next day described the bullet wounds on the deer similarly as described by Ramsay and his companion. As soon as Ramsay discovered on the 22d that some one had taken the slaughtered deer, he notified the game warden and early the next morning notified the sheriff of Sevier county. The next day, the 24th, the sheriff, Ramsay, and another

who had seen the deer hanging in the tree, went to the Fennell Meat Market to examine the deer brought there by the defendants. There, Ramsay and such other, in the presence of the sheriff and of one of the defendants and of others, identified the deer as the deer shot and killed by Ramsay. The sheriff, Ramsay, and such other testified that the deer so examined by them was a buck deer weighing about 250 pounds and that on their examination of the deer they found three legs removed at the knee joint, the right front leg removed four or five inches above the knee, a flesh bullet wound in the brisket but which in the meantime had been slit and cut, a bullet wound on the back behind the shoulders and to the left of the backbone, and that the range of the bullet was downward and forward in the direction of the heart, and that they saw or found no exit of that bullet; that at the time of such examination one of the horns of the deer had been broken off, but which, as then claimed by one of the defendants present, was shot off by them when they killed the deer and who also claimed that one of the shots fired by them struck the deer in the right front leg above the knee and that they removed and left the legs in the mountains where the deer was shot. On being asked if he could produce the legs so removed, he replied that he did not know whether he could find the place in the mountains or not, to which Ramsay stated that the defendants could not find them, as he (Ramsay), on discovering that his deer had been taken, went to the place where he had removed the legs and there found and took them in his possession. On the trial they were put in evidence by the state.

Now it was the claim of the defendants, and they so testified, that on the afternoon of the 22d they killed the deer taken by them to the meat market and which was identified by Ramsay and others as the deer killed by Ramsay; that in shooting the deer they shot off one horn of the deer, shot and broke the right front leg above the knee, that the deer when he was shot was practically on the same eleva-

tion with the defendants, and that the bullet of one shot went through the back of the deer just below the backbone and in a horizontal course came out on the opposite side; and that after they had slaughtered the deer they put it on a small black horse to be carried down the mountain, but finding that the horse was too small to carry the deer they placed him on a larger horse. They denied all knowledge of the deer killed by Ramsay or that they were within several miles of the place where Ramsay claimed he killed a deer, and denied that they had anything to do with the taking of Ramsay's deer. Evidence was also given to show that when Ramsay was hanging in the tree the deer shot and killed by him, a small boy on foot was at or about the place, presumably from one of the camps of other hunters and that there were numerous other hunters in the mountains hunting deer.

At the trial the hide of the deer claimed by the defendants to be the hide of the deer found at the meat market, and which there was identified by Ramsay and others as the deer shot and killed by Ramsay, was put in evidence. The sheriff of Sevier county and Ramsay, who testified on behalf of the state, on cross-examination were shown the hide and were asked if it was the hide of the deer examined by them at the meat market. They answered that the hide was so dried and all twisted up that they were unable to identify it and were unable to say whether it was or was not the same hide. Another witness called by the state on cross-examination testified that he would not say whether it was or was not the same hide, but thought it looked like the same hide.

The claim of the defendants and their counsel was that the hide so exhibited in court showed the entrance of a bullet on the left side below the backbone and a larger bullet hole on the opposite side, indicating, as it is claimed that the deer was shot through the back and that the range of the bullet was in a horizontal direction. Other witnesses testified on behalf of the defendants that after the hide was

removed, the carcass of the deer showed the course of a bullet in a horizontal direction from one side to the other of the deer just below the backbone. The sheriff, Ramsay, and other witnesses who had examined the hide while it was yet on the carcass, testified that they found but one bullet hole in the back which ranged downward and forward and toward the heart and that upon their examination they did not find any place where the bullet left the body.

Thus it is urged that by the hide it was conclusively shown that the bullet which entered the left side just below the backbone had its exit on the right side immediately opposite the entrance, and that Ramsay when he shot, standing as he testified a considerable distance higher up the steep mountain side than was the deer and shooting in such position, could not have inflicted such a wound on the deer as was shown by the hide, and hence the deer possessed by the defendants and found in the meat market was not the deer shot and killed by Ramsay.

We think the contention mere argument, well enough to be made to a jury or to the trier of facts, but is not of such character as to conclusively overcome the probative effect of the state's evidence heretofore referred to. The hide itself is not before us, and if it were it would not be of much avail, for we are not the tribunal to try or find the facts. However, the character of the hide, as on the record described by some of the witnesses, showing as is contended the exit of a bullet at the point claimed, is to some extent uncertain, and as so described by such witnesses may have been caused by a bullet, or by an opening or tear in the hide from other causes. When the sheriff, Ramsay, and others examined the deer at the meat market and when the hide was yet on the carcass, no claim was then made by the defendants or either of them or by any one that the bullet causing the wound on the back coursed in a horizontal direction clear through the body of the deer; and no such claim was made until sometime after the hide had been removed from the

carcass. Though it be assumed that the course of the bullet through the back of the deer was as claimed by the defendants, yet it was for the jury, not for us, to say whether, when the shot was fired, the respective positions of Ramsay and of the deer were such as to render the infliction of such a wound on the deer impossible. The positions, directions, and distances having been described only relatively or approximately and not with any degree of exactness or certainty, the conclusion may not be deduced with any more exactness or certainty. To deduce the conclusion to the methematical certainty or exactness contended for requires exactness and certainty of factors or premises upon or from which the conclusion is to be deduced. And then, though such exactness and certainty had been given, we think it was for the jury and not for us to make the calculation or deduction. We think the evidence adduced by the state is sufficient to justify the verdict.

One of the defendants on the witness stand was asked by his counsel, "What was the reason for suddenly leaving the hunting ground," after the defendants had shot and killed the deer claimed to have been shot and killed by them: "Had you any information that caused you to be anxious to leave there? Why did you leave there that day? Was your wife at that time being confined?" Objections by the state to all these questions were sustained. When the objections were made, counsel for the defendants stated that the state claimed the defendants tried to run away, and for that reason the questions were proper. On inquiry by the court if anything was claimed because of the sudden leaving of the defendants, the district attorney replied that there was not. Thereupon the objections were sustained. These rulings are complained of. If there were any adverse inferences deducible from the manner in or circumstances under which the defendants left the hunting grounds, they undoubtedly had the right to explain the cause of any sudden leaving, or to rebut any inference adverse to them as to the manner of their leav-

ing, regardless of the disclaimer of the district attorney, for if any such inference was deducible from the circumstances or manner of leaving, the jury as well as the district attorney was at liberty to deduce the inference and consider it. We think the court ought to have permitted the questions to be answered. However, because of the disclaimer of the district attorney in the presence of the jury, we think the rulings were not of such prejudicial effect as to require a reversal of the judgment.

There are other assignments as to the refusal of the court on objections made by the state to permit answers of witnesses concerning other matters. We think them of less importance than the assignment just considered. At any rate, the rulings were not of such character as calculated to do harm, and did not tend to prejudicially affect any substantial right of the defendants.

The judgment of the court below is thus affirmed.

CHERRY, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.